**IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

**No. 23-2182**
_____

**ALBERT COLLINS
Plaintiff-Appellant,**

**v.**

**KANSAS CITY, MISSOURI PUBLIC SCHOOL DISTRICT,
Defendant-Appellee.**

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION
HONORABLE GARY FENNER, DISTRICT JUDGE

**BRIEF FOR APPELLANT ALBERT COLLINS**

 **/s/Gerald Gray II**
Gerald Gray II, #67476
**G. GRAY LAW, LLC**
104 WEST 9TH STREET, SUITE 401
KANSAS CITY, MO 64105
(O) 816-888-3145
(F) 816-817-4683
ggraylaw@outlook.com
**ATTORNEY FOR
PLAINTIFF-APPELLANT**

# **SUMMARY OF THE CASE**

Albert Collins ("Collins or Appellant") appeals the Court's Judgment which granted Kansas City, Missouri Public School District ("District," "KCPS," or "Appellee") summary judgment. Collins worked at KCPS from 2005 until he was terminated on December 9, 2019, for allegedly adjusting attendance data in violation of KCPS policy in 2016 under his former supervisor Sam Johnson's ("Johnson") leadership. Johnson reported directly to KCPS's top leadership overseeing "attendance parties" where District employees adjusted attendance records for students without documentation ("fraud"). Johnson left KCPS and used evidence he received from Collins to report attendance fraud to the Department of Elementary and Secondary Education ("DESE").

KCPS argued there was no discrimination or retaliation and Collins cannot be a "whistleblower" because he reported his own unlawful conduct which is a "statutory exception" and the Court agreed and granted summary judgment. Collins believes the Court erred. Collins believes oral argument is necessary. Twenty minutes per side would be sufficient if this case is set for argument.

## TABLE OF CONTENTS

SUMMARY OF THE CASE…………………………………..………….....2

TABLE OF CONTENTS………………………………………….…....3

TABLE OF AUTHORITIES…………………………..………...…...4

JURISDICTIONAL STATEMENT……………………………….…....8

STATEMENT OF ISSUES………………………………………9

STATEMENT OF THE CASE………………..…………………..10

A.      Procedural History………………………………….………..10

B.      Statement of the Facts…………………………..………...12

SUMMARY OF THE ARGUMENTS………………………………….25

ARGUMENTS………………………………………….……..25

    I.      Whether Court erred in granting summary judgment to KCPS under Fed. R. Civ. P. 56(c) because there was sufficient evidence to support a finding that the circumstances surrounding Collins termination gave rise to an inference of racial discrimination under Title VII. (App. 1327-1357 R.Doc. 99 at 1-31; App. 1358-1360 R.Doc. 100 at 1-3). *Beasley v. Warren Unilube, Inc*., 933 F.3d 932, 937 (8th Cir. 2019).

        A. Bishop, LC, and other employees in fraud are proper comparators to Collins. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008).

        B. The Court relied upon inadmissible hearsay in granting summary judgment in the form of sham declarations. *Bryant v. Bryan Cave, LLP*, 400 S.W.3d 325, 332–33 (Mo. App. E.D. 2013); *Button v. Dakota, Minnesota & Eastern R.Corp.*, 963 F.3d 824, 830 (8th Cir.2020).

3

**II.** Whether Court erred in granting summary judgment to KCPS under Fed. R. Civ. P. 56(c) because there is evidence to support a finding that Collins engaged in protected activity. (App. 1327-1357 R.Doc. 99 at 1-31; App. 1358-1360 R.Doc. 100 at 1-3). *EEOC v. Kohler Co.,* **335 F.3d 766, 772 (8th Cir.2003).**

      **A.** There is sufficient evidence of pretext to create a genuine issue of material fact despite any alleged legitimate reason KCPS gave for terminating Collins. *Logan v. Liberty Healthcare Corp*., **416 F.3d 877, 880 (8th Cir.2005).**

**III.** Whether Court erred in granting summary judgment to KCPS under Fed. R. Civ. P. 56(c) because evidence that Collins was a whistleblower under the statute and no exception applied to justify his termination. (App. 1327-1357 R.Doc. 99; App. 1358-1360 R.Doc. 100 at 1-3). *Hudson v. O'Brien*, **449 S.W.3d 87, 91-92 (Mo. App. W.D. 2014);**

      **A.** There is a genuine issue of material fact regarding whether Collins was a whistleblower regardless of his alleged actions. *Warner v. Graham*, **845 F.2d 179, 182 (8th Cir. 1988).**

**CONCLUSION**……………………………………………………….….**54**

**CERTIFICATE OF COMPLIANCE**……………………………………..**54-55**

**CERTIFICATE OF SERVICE**……………………………………...**54-55**

<u>**TABLE OF AUTHORITIES**</u>

**Page**

**CASES**

*Abuy Develop., L.L.C. v. Yuba Motorsports, Inc.*, No. 4:06CV799SNL, 2008 WL 1777412 (E.D. Mo. Apr. 16, 2008)……………………………………………………….41

*Agristor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987)…………………..26

*Baker v. Silver Oak Senior Living Manag. Co.*, 581 F.3d 684 (8th Cir.2009)……41

*Banks v. Deere*, 829 F.3d 661, 666 (8th Cir.2016)……………………….…......29

*Beasley v. Warren Unilube, Inc*., 933 F.3d 932, 937 (8th Cir. 2019) …………….29

*Blum v. Allstate Ins. Co.,* 296 F.Supp.2d 1037, 1039 (E.D.Mo.2003)………........51

*Brandenburg v. Allstate Ins. Co.*, 23 F.3d 1438 (8th Cir. 1994)…………………51

*Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005) ……………….42

*Bryant v. Bryan Cave, LLP*, 400 S.W.3d 325, 332–33 (Mo. App. E.D. 2013)…....39

*Burton v. Ark. Sec'y of State*, 737 F.3d 1219 (8th Cir. 2013)………..……..……..28

*Button v. Dakota, Minnesota & Eastern R.Corp.*, 963 F.3d 824 (8th Cir.2020) ……………………………………………………………………….41

*Calhoun v. Baylor*, 646 F.2d 1158……………………………………………...43

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ..26

*Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 909–10 (8th Cir.2010)………..26

*Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir.2016)……….……..26

*Dindinger v. Allsteel, Inc.*, 853 F.3d 414 (8th Cir. 2017)……..………………...36-37

*EEOC v. Kohler Co.,* 335 F.3d 766, 772 (8th Cir.2003)…………………………44

*Equal Employment Opportunity Comm'n v. Watergate at Landmark Condo.,* 24 F.3d 635 (4th Cir.1994)…………………………………………………………...37

*Evance v. Trumann Health Servs., LLC*, 719 F.3d 673, 678 (8th Cir.2013)……...45

*Fitzpatrick v. Hoehn,* 746 S.W.2d 652, 655 (Mo.App.E.D.1988)……………....…42

*Garang v. City of Ames*, 2 F.4th 1115, 1122 (8th Cir.2021)……………………...41

*Granda v. City of St. Louis*, 472 F.3d 565, 568 (8th Cir. 2007)……………..……30

5

*Gustafson v. Cornelius Co.*, 724 F.2d 75 (8th Cir. 1983)…………………………32

*Hawkins v. Hennepin Tech. Ctr.*, 900 F.2d 153, 155–56 (8th Cir.1990)…..……...36

*Hudson v. O'Brien*, 449 S.W.3d 87, 91-92 (Mo. App. W.D. 2014)………………52

*ITT Commercial Fin. Corp. v. Mid-America Marine Supp. Corp.*, 854 S.W. 2d 371 (Mo. banc 1993)………………………………………………………….……….27

*Johnson v. City of Leadington*, No. 4:19-CV-02282-SEP, 2022 WL 179218 (E.D. Mo. Jan. 20, 2022)………………………………………………………………..53

*Johnson v. Douglas Cnty. Med. Dep't,* 725 F.3d 825 (8th Cir. 2013)…………31-32

*Johnson v. Herman*, N.D.Ind.2001, 132 F.Supp.2d 1130………..………………..43

*Kneibert v. Thomson Newspapers*, 129 F.3d 444, (8th Cir.1997)………..………..46

*Kobrin v. University of Minnesota,* 34 F.3d 698, 703 (8th Cir.1994)…………….46

*Kratzer v. Rockwell Collins. Inc.,* 398 F.3d 1040, 1048 (8th Cir.2005)…………..44

*Anderson v.  Liberty Lobby, In*c., 477 U.S. 242 (1986)………...…………………27

*Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir.2005) …………. 45

*Mahn v. Jefferson Cty., Mo.*, 891 F.3d 1093 (8th Cir.2018)………….………..29

*May & May Trucking, LLC v. Progressive Northwestern Ins. Co.*, 429 S.W. 3d 511 (Mo. App. W.D. 2014)……………………………………………………….......42

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)…………….…28, 44-46

*Missouri v. Hunter*, 459 U.S. 359, 366-68 (1983)………………………………..50

*Novak v. Navistar Int'l Transp. Co.,* 46 F.3d 844, 847 (8th Cir.1995)……………51

*Orion Fin. Corp. of S. Dak. v. Am. Food Group, Inc.,* 281 F.3d 733 (8th Cir.2002)
……………………………………………………………………………….51

*Parktown Imports, Inc. v. Audi of Am., Inc.*, 278 S.W.3d 670, 672 (Mo. 2009)….51

*Perkel v. Stringfellow*, 19 S.W.3d 141, 149 (Mo. App. S.D. 2000)………………32

*Pink Supply Corp. v. Hiebert, Inc.,* 788 F.2d 1313 (8th Cir.1986)………………..40

*Reeves v. Sanderson Plumbing Products, Inc*. 530 U.S. 133(U.S. 2000)…….27, 48

*Richest v. City of Kansas City*, 643 S.W.3d 610 (Mo. App. W.D. 2022)……. …. 52

*Scheerer v. Hardee's Food Systems, Inc*., C.A.8 (Mo.) 1996, 92 F.3d 702……….43

*Sherman v. Runyon,* 235 F.3d 406, 410 (8th Cir.2000)…………………………..45

*Shirrell v. St. Francis Med. Ctr*., 793 F.3d 881, 887 (8th Cir. 2015)…..…………28

*Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 833 (8th Cir.2002)………………..45

*Smith v. Planned Parenthood of the St. Louis Region,* 225 F.R.D. 233
(E.D.Mo.2004)………………………………………………………………….51

*Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008)…..………..37

*State v. Kemp,* 212 S.W.3d 135, 146 (Mo. banc 2007)…………..……………..39

*State Farm Fire & Casualty Co. v. Air Vents, Inc.*, 577 F. Supp. 3d 941 (N.D. Ia.
2021)……………………………………..…………………………………..42

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1045-46 (8th Cir. 2011)…….….28

*Uhle v. Sachs Electric,* 831 S.W.2d 774, 777 (Mo.App. E.D.1992)…………..….41

*U.S. v. Consol*e, 13 F.3d 641……………………………………………..…..42

*Vogt v. Emmons,* 158 S.W.3d 243, 247 (Mo. App. E. D 2005)……………..…..32

*Ware v. Jackson County, Missouri.*, 150 F.3d 873, 880 (8th Cir. 1998)…….....30

*Warner v. Graham*, 845 F.2d 179, 182 (8th Cir. 1988)……………………………54

*Watson v. McDonough,* 996 F.3d 850, 854 (8th Cir. 2021)…………………...…..28

*Wright v. West,* 505 U.S. 277 (1992) …………………………………………..48

*Yates v. Rexton, Inc*., 267 F.3d 793, 802 (8th Cir. 2001) ………………………37

*Zean v. Fairview Health Servs*., 858 F.3d 520, 526 (8th Cir. 2017)……………...32

## STATUTES

RSMo. 105.055……………………………………………………….......26, 51-54

Fed.R.Civ.P. 56(c)…………………………………………………………....26

§ 1983……………………………………………………………………28-30

Title VII………………………………………………………………….28-29

28 U.S.C. §1291…………………………………………………………….8-9

28 U.S.C. §1332………………………………………………………………8

## JURISDICTIONAL STATEMENT

Collins' claims were brought in the Western District of Missouri. The Court had jurisdiction over this matter pursuant to 28 U.S.C. §1332. The Honorable Judge Gary Fenner issued summary judgment on Collins' claims on April 12, 2023. **App. 1327-1357 R. Doc. 99 at 1-31; App. 1358-1360 R.Doc. 100 at 1-3.** Court granting of summary judgment constitutes final judgment. Appellant timely filed notice of appeal May 11, 2023. **App. 1481 R.Doc. 103 at 1**. This Court has

appellate jurisdiction pursuant to 28 U.S.C. §1291, providing for jurisdiction of the

courts of appeals over appeals from final judgments.

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

**No. 23-2182**

**ALBERT COLLINS**
**Plaintiff-Appellant,**

**v.**

**KANSAS CITY, MISSOURI PUBLIC SCHOOL DISTRICT,**
**Defendant-Appellee.**

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION
HONORABLE GARY FENNER, DISTRICT JUDGE

**STATEMENT OF THE ISSUES**

**I.**

I.     **Whether Court erred in granting summary judgment to KCPS under Fed. R. Civ. P. 56(c) because there was sufficient evidence to support a finding that the circumstances surrounding Collins termination gave rise to an inference of racial discrimination under Title VII. (App. 1327-1357 R.Doc. 99 at 1-31; App. 1358-1360 R.Doc. 100 at 1-3).** *Beasley v. Warren Unilube, Inc*., **933 F.3d 932, 937 (8th Cir. 2019).**

A. Bishop, LC, and other employees in fraud are proper comparators to Collins. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008).

B. The Court relied upon inadmissible hearsay in granting summary judgment in the form of sham declarations. *Bryant v. Bryan Cave, LLP*, 400 S.W.3d 325, 332–33 (Mo. App. E.D. 2013); *Button v. Dakota, Minnesota & Eastern R.Corp.*, 963 F.3d 824, 830 (8th Cir.2020).

II. Whether Court erred in granting summary judgment to KCPS under Fed. R. Civ. P. 56(c) because there is evidence to support a finding that Collins engaged in protected activity. (App. 1327-1357 R.Doc. 99 at 1-31; App. 1358-1360 R.Doc. 100 at 1-3). *EEOC v. Kohler Co.*, 335 F.3d 766, 772 (8th Cir.2003).

A. There is sufficient evidence of pretext to create a genuine issue of material fact despite any alleged legitimate reason KCPS gave for terminating Collins. *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir.2005).

III. Whether Court erred in granting summary judgment to KCPS under Fed. R. Civ. P. 56(c) because evidence that Collins was a whistleblower under the statute and no exception applied to justify his termination. (App. 1327-1357 R.Doc. 99 at 1-31; App. 1358-1360 R.Doc. 100 at 1-3). *Hudson v. O'Brien*, 449 S.W.3d 87, 91-92 (Mo. App. W.D. 2014);

A. There is a genuine issue of material fact regarding whether Collins was a whistleblower regardless of his alleged actions. *Warner v. Graham*, 845 F.2d 179, 182 (8th Cir. 1988).

## STATEMENT OF THE CASE

A.                                    PROCEDURAL HISTORY

Collins filed his action in Jackson County, Missouri on April 14, 2020, and

it was removed to the Western District of Missouri September 21, 2020. **App. 1-68**

**R.Doc. 1 at 1-68**. KCPS filed their answer October 1, 2020. **App. 69-97 R.Doc. 4 at 1-28**. On October 14, 2020, Collins filed a motion to remand. **App. 98-106 R.Doc. 5 at 1-8**. On November 10, 2020, the Court issued an order on remand. **App. 117-124 R.Doc. 11 at 1-7**. On December 2, 2022, KCPS filed for summary judgment ("summary judgment"). **App. 158-329 R.Doc. 39-41 at 1-2, 1-16, & 1-17**. On January 13, 2023, Collins filed his opposition to summary judgment. **App. 375-427 R.Doc. 47 at 1-52**.[1] On January 27, 2023, KCPS filed their reply in support of summary judgment and motion to strike witnesses and exhibits used by Collins in opposition. **App. 1024-1229 R.Doc. 50-52 at 1-31, 1-2, & 1-19**. On February 10, 2023, Collins opposed KCPS's motion to strike. **App. 1230-1238 R.Doc. 53 at 1-9**. On February 24, 2023, KCPS filed their reply in support of their motion to strike. **App. 1293-1304 R.Doc. 54 at 1-11**.

On April 11, 2023, the Court granted summary judgment and issued a judgment. **See App. 1327-1360 R.Doc. 97-98, see also 99-100 at 1-31 & 1-3**.[2] The Court denied KCPS's motion to strike finding essentially that their arguments were not made in good faith. **Id.** On April 12, 2023, the Court issued an amended order and judgment. **App. 1327-1357 R.Doc. 99 at 1-31; App. 1358-1360 R.Doc.100 at**

---

[1] See also Supporting exhibits App. 428-1023 R. Doc. 47-1 through 47-22.

[2] R. Doc. 97-98 was nullified by App. 1327-1360 R. Doc. 99-100 at 1-31 & 1-3, therefore was not included in this appendix for efficiency purposes.

**1-3**. On April 21, 2023, KCPS filed a proposed bill of costs. **App. 1361-1380 R.Doc. 101 at 1-20**. On May 8, 2023, costs were taxed against Collins. **App. 1390 R.Doc. 102 at 1**. On May 11, 2023, Collins filed his notice of appeal in this matter. **App. 1481 R.Doc. 103 at 1**.

**B.**                              **STATEMENT OF THE FACTS**

Collins started at KCPS in approximately 2005 or 2006 and served in many roles during his employment with KCPS. **App. 375-427 R.Doc. 47 at 32 ¶148-150**. KCPS, Dr. Collier, and Overton have a history of mistreating minority employees, including those in interracial relationships. **App. 375-427 R.Doc. 47 at 21, 33 ¶89, 152**.[3] Collins worked under Johnson and alongside countless employees performing his job duties including but not limited to principals, secretaries, and Information Technology Services Department ("IT") personnel. **App. 375-427 R.Doc. 47 at 33-34 ¶153-161**. Johnson supervised fourteen (14)

---

[3] Collins ask the Court to take Judicial Notice of the lawsuit filed by April Waterman in Jackson County, Missouri's 16th Judicial Circuit, Case No. 2116-CV01848, filed January 21, 2021 alleging amongst other things race discrimination and retaliation under the MHRA, as well as whistleblower claims under RSMo 105.055. See App. 1391-1414.

April Waterman ("Waterman"), a former KCPS administrative assistant to Reynolds, also alleged in her lawsuit that she and others were mistreated because it was known in the KCPS workplace that she was married to a white man. Collins ask the Court to take Judicial Notice of the lawsuit filed by Joseph D. Baldridge v. KCPS & Overton in Jackson County, Missouri's 16th Judicial Circuit, Case No. 1716-CV31753, filed December 22, 2017 alleging disability discrimination and retaliation under the MHRA. See App. 1415-1422.

employees, reported to Cordoba the Executive Director of OSI, and Murrillo KCPS's Chief Academic & Accountability Officer who gave Johnson directives to increase attendance statistics. **Id**. Cordoba reported to Mike Reynolds ("Reynolds"), the KCPS Director of Accountability, Reynolds reported to Murillo, the acting assistant superintendent and superintendent. **Id. at 9 ¶25**. Johnson oversaw "attendance parties" where every KCPS secretary went to the BOE to change attendance numbers including Laquyn Collier ("LC"). **Id. at 33 ¶155**. Cordoba and Murillo promised to provide supporting documentation for the attendance changes but did not. **Id**. These directives were district-wide and went to Principals to implement at every school. **Id**. Rick Bishop ("Bishop") oversaw the project which is known as "attendance fraud." **Id**.

Collins was directed to clean up attendance by changing attendance codes to improve KCPS attendance records. **Id. at 14 ¶53-60**. Collins understood that he was to alter attendance records until "they the goal." **Id. at 16 ¶6**3. The OSI department was dismantled in August 2016 and Johnson was demoted to Attendance Dropout Specialist. **App. 45-66 R.Doc. 1-2 at 6  ¶37**. In fall 2016, Collins' job title changed to Specialist but he continued to report to Southeast where his nickname was "attendance Guru". **Id. at 6 ¶38, 40**. Collins continued to communicate with Johnson even offering full support in reporting KCPS treatment or conduct. I**d. at 6-7 ¶41-46**. In approximately April 2017, Johnson resigned due

to harassment and retaliation. **Id. ¶44**. Johnson provided Collins' name in his reports to outside agencies. **Id. ¶48**.

Johnson filed a lawsuit alleging harassment and retaliation and reported attendance fraud to DESE with documents exchanged with Collins also named as a witness which required KCPS to repay approximately $194,000 in funding to DESE.[4] **App. 375-427 R.Doc. 47 at 1-52 ¶1, 99, 164-165; App. 999-1000 R.Doc. 47-10 at 1-2**. Collins considered himself a witness. **App. 375-427 R.Doc. 47 at 19 ¶77-80**. Collins worked with Reynolds, the head of KCPS's IT and other decision-makers, regarding attendance work including fraud. **App. 375-427 R.Doc. 47 at 34 ¶161**. KCPS admits Bishop was a Data Warehouse Project Leader & Enterprise Applications Team Leader in IT. **Id. at 11 ¶34-35**. Bishop, a white employee with a leadership role in the fraud was not fired evidencing of discrimination. **Id**.

On February 25, 2019, DESE met with KCPS representatives regarding Johnson's report then on February 28, 2019, KCPS officials Overton and Dr. Collier interrogated Collins regarding the fraud before placing him on administrative leave. **Id. at 22, 35 ¶99-101, 167**. Overton has been the Director of

---

[4] Collins ask the Court to take Judicial Notice of Johnson's lawsuit originally filed in Jackson County, Missouri's 16th Judicial Circuit on March 4, 2020, Case No. 2016-CV08056. Johnson's case was removed to the Western District of Missouri Federal Court in Kansas City. See Case No. 4:20-cv-00277-BP. See App. 14440-1480.

KCPS Employee Relations since 2012. **Id. at 21 ¶90**. In 2016, Dr. Collier was the highest-ranking official in KCPS's Human Resources Department until she was promoted to interim superintendent in 2022. **Id. ¶88, 91-93**. Collins reported widespread attendance fraud and witnessing Johnson's allegations of harassment and retaliation prior to being suspended and never returning. **Id. at 7, 35 ¶11, 168**. Collins reported his belief that he was being discriminated against and provided examples of how he was not considered for other opportunities. **Id**.

Collins did not believe working on attendance from his personal computer was a violation of KCPS policy nor that he had done anything wrong. **Id. at 13-34 ¶51-52, 61, 71, 118-119, 135, 140, 155, 159-160**. Johnson also testified Collins did nothing wrong, and no evidence suggests Collins had decision-making authority about which students' records were altered but he was instructed by employees with decision-making authority. **Id**.

Dr. Collier and Overton fired Collins on December 9, 2019 for conduct that allegedly occurred in 2016. **Id. at 25-26 ¶116-117**. Collins left KCPS from being fired and went to the EEOC office to file a charge which was officially signed on January 8, 2020 with a right to sue letter being issued by the EEOC a week later. **Id. at 6-10 ¶7, 20-21, 32**.

Judge Fenner allowed KCPS to use hearsay evidence via declarations regarding Bishop's job duties, his actions, and culpability in attendance fraud in

comparison to Collins as well as the culpability and of other KCPS employees who did what Collins did but was not fired. **Id. at 22-26 ¶99, 118-119**.[5] Dr. Collier's declaration stated other KCPS employees were not fired for attendance fraud because they relied on erroneous interpretation of information from leadership despite no evidence supporting this assertion. **Id. at 31-32 ¶141-147**. Dr. Collier acknowledged attendance fraud was district-wide and involved many employees who were not fired. **Id. at 31-35 ¶141-147, 153-162, 164-172**. Dr. Collier and Overton's previous testimony related to the attendance fraud never referenced any misinterpretation but repeatedly testified attendance fraud was limited to a handful of employees including Collins, LC, Johnson, Cordoba, Murillo, Reynolds and a few others in leadership. **Id. at 18-35 ¶76, 85, 101, 115, 136-137, 158-159**. Of the seven KCPS employees previously identified to be involved in the attendance fraud, only Collins and LC were not in a leadership or executive role. **Id. at 32-35 ¶137, 159**. Dr. Collier testified as follows regarding the attendance fraud investigation:

Q.· · ·Okay.· Do you know who all was involved in that investigation? ·
A.· · ·I know there was an outside firm that conducted the investigation.
Q.· · ·Okay. ·
A.· · ·So it wasn't internal folks.· The ·notice came to our District and internal folks got ·information initially, but a decision was made· quickly to

---

[5] KCPS also used declarations which created inconsistent testimony with the declarant and created genuine issue of material fact but the Court erroneously accepted KCPS's declarations as true.

go outside so that the impartial ·investigation could happen, with so many people, so ·many people in some of the senior level positions being involved. · · ·

Q.· · ·Okay.

A.· · ·So it went out mainly for that reason.· · · ·

Q.· · ·So, to your knowledge, was any of the investigation conducted internally? · · · ·

A.· · ·If so, it was very minimal.· · · · ·

Q.· · ·Okay.· And when you say minimal, what do you mean by that?· What, if anything, do you recall being internal in terms of the investigation?

A.· · ·Well, I think initially Marilyn was notified and then our IT folks were notified so that they could start, like, pulling any documentation. But I think that was, once again, that was short lived.

Q.· · ·Do you know if Marilyn or anyone else that are KCPS employees ever conducted any ·interviews? · · ·

A.· · ·I don't think anybody internally did ·any interviews.· Well, not of the senior level leaders. · · · · · ·

Q.· · ·Okay. · · · · · ·

A.· · ·I think later after the investigation came back there was some interviewing that happened ·for some of the other people that were named --

Q.· · ·Okay.

A.· · ·-- in the investigation.· · · · · ·

Q.· · ·All right.· And who were the other· ·people that were named? ·

A.· · ·There was a secretary, LaQuyn Collier. And a dropout prevention specialist, I think that was his title, Collins is the last name, Albert Collins.

Q.· · ·Okay.· And what was his -- do you know  ·what LaQuyn Collier's -I assume she's female? · ·

A.· · ·Yes. · · · ·

Q.· · ·Do you know what her race is? · ·

A.              ·African              American.              ·              ·              ·              ·              ·

Q.· · ·All right.· And what about did you say ·Albert Collins?

A.· · ·Yes. · · · · ·

Q.· · ·Is that a man, I assume a male?

A.· · ·Yes. · · · · ·

Q.· · ·What is his race? · · · · · ·

A.· · ·African American.· · · · · ·

Q.· · ·Okay.· What did you say Albert ·Collins's job title was? · · ·

A.· · ·I believe it was dropout prevention specialist.

Q.· · ·And those individuals were not ·decision makers, correct? · · · ·

17

A.· · ·No.· They weren't. · ·
**See App. 841-910 R.Doc. 47-4 at 42:13-45:20**.

After a break, Dr. Collier further testified as follows:

Q.· · ·So, in regards to Sam Johnson, you said -- so he was in a supervisor role?· · · · ·
A.· · ·Yes.· · · · · ·
Q.· · ·Okay.· But you don't know what his job·title was?· · · · ·
A.· · ·I don't remember the job title now no.· · · · · ·
Q.·So, as a supervisor, he would be considered a decision maker, correct?
A.· · ·Yes.· · · ·
Q.·· ·Now do dropout prevention specialists manage any employees?
A.· · ·No.· · · · · ·
Q.· · ·Do secretaries manage any employees?· · · · ·
A.· · ·No.· They don't. **App. 841-910 R.Doc. 47-4 at 46:15-48:23**.

Dr. Collier went on to testify about her knowledge of the attendance fraud:

Q.· · ·So based on the investigation, were the numbers getting changed from the school level?
A.· · ·No.· It was not at the school level. It was not in the school level. There were people that were asked to help do this, like after work hours.· Like, it wasn't, like, schools were not involved in the.· Most schools had no idea this was going on.
Q.· · ·How would a school not know that it's going on if it's -- ·
A.· · ·Because they weren't asked to go in·and change numbers, so they wouldn't know that that's ·happening.· And so these are, like, numbers that are being changed after the fact.· They're not seeing all of that.· Only the people who were asked to come down to help do it are the ones who knew it was happening.
Q.· · ·Okay.· And then the individuals that you named earlier, and that would being Mike Reynolds, Vicki Murillo, Luis Córdoba, Al Tunis are the individuals that you're aware of that were asking people to come and make those changes?· · · · · ·
A.· · ·I would just say all of them had knowledge, some knowledge, of what was going on. I don't know that each of them actually verbally asked or put in an email that they asked, but they all had knowledge of what was going

on.· But there were a couple people that did ask, which were Mike Reynolds and Luis Córdoba. ·

Q.· ·Okay.· Now anybody that we have -- that you're aware of that was involved in the ·investigation but we have not discussed?· · · ·

·A.· mean, not that I remember.· Like I said, it was a while ago and I didn't have, like, immediate involvement.· That's, you know, that's what ·I remember and who I remember being involved. · · · · ·

Q.· ·Okay.· Now do you know why these individuals were terminated if it was allegedly no longer going on? · · · · ·

A.· · ·Because, I mean, that's fraud. · · · · ·

Q.· · ·Well, did the individuals know that it was fraud at the time? ·

A.· · ·I don't know that it matters whether they knew.· Ignorance of the law doesn't free you from being responsible for your behavior. · · ·

Q.· · ·Okay.· · · · ·

A.· · ·But I think you're going back and changing numbers, you kind of know, I mean, I would hope you would realize what you're doing. ·

Q.· · ·Okay. · · · ·

A.· · ·If you're changing numbers without documentation to support it, I mean, I would ask a question why am I changing these.· That's probably ·what I would have done.

Q.· · ·Right.· Is that what the individuals were doing?· Or do you know?

A.· · ·What I was told they were changing numbers. · · · · ·

Q.· · ·Right.· But did they -- do you know if they asked? · · · · ·

A.· · ·I don't know if they asked that. · · · ·

Q.· · ·Okay.· That wasn't something that you inquired about? · · · · ·

A.· · ·No.· Because I didn't do the investigation. · · · · ·

Q.· · ·Okay.· Now isn't it true that before Mike Reynolds was allowed to resign in lieu of termination, he was out on administrative leave, correct?

A.· · ·That's correct. **App. 841-910 R.Doc. 47-4 at 57:20-59:20**.

KCPS engaged in widespread attendance fraud to regain accreditation from the state. **App. 375-427 R. Doc. 47 at 33 ¶153-157**.  Collins and LC reported the superintendent of KCPS was involved. **Id. at 35 ¶169**. There is no direct evidence anyone other than Collins and LC were interviewed during the investigation. **Id. at 33-36 ¶167-172; App. 841-910 R.Doc. 47-4 at 42:13-45:20 & 57:20-59:20**.  They

were also the only two employees of the seven KCPS identified in their newsletter who were African American & fired. **Id.; see also App. 999-1000 R.Doc. 47-10 at 1-2; App. 375-427 R.Doc. 47 at 33 ¶157-159; App. 841-910 R.Doc. 47-4 at 46:15-48:23, 42:13-45:20, 57:20-59:20**. Dr. Collier's testimony about her knowledge of the attendance fraud was:

Q. All right. Can you tell me what that was?
A. Several years ago there was an investigation conducted around the attendance for the Kansas City public schools. And it was alleged that there were there was some, I guess, inflating of numbers. And when that information came to us, an investigation started immediately for those who were named. He was one of the persons that was named. So the investigation was conducted by an outside firm. It was nobody internally because it was a lot of higher-up employees that were named. So it wasn't appropriate for us to conduct the investigation, an outside firm did that. And so it was concluded that he was involved in that. And so there was a separation that happened.
Q. Okay. And you said -- so you would agree that this inflation of numbers, as you define it did occur; correct?
A. Yes, it did.
Q. All right. And Reynolds did have some involvement in that; correct?
A. He did.
Q. All right. Now, how many people were determined to be involved in that?
A. I believe there were four executive level folks would who were involved. And then there were two non-executive staff members that had immediate involvement.
Q. Do you know who those individuals were at the executive level?
A. Yes, they were Michael Reynolds, who we've already named. There was Luis Cordoba, Vickie Murillo, and Al Tunis.
Q. All right. Now, do you know what Mike Reynolds' race is?
A. He's white.
Q. All right. He's a male?
A. That's correct.
Q. All right. What about Luis Cordoba?
A. He's Hispanic male.

Q. Okay. And Vickie Murillo?

A. White, female.

Q. All right. And what about Al Tunis?

A. White, male. Q. Okay. Now, all of those executive level employees, did they -- were they terminated or did they resign?

A. Two of them were no longer with KCPS at that time. So they had already separated. The other two were allowed to resign in lieu of termination.

Q. Okay. You stated that there were two non-executive level employees that were involved as well; correct?

A. Yes.

Q. All right. Who were those individuals?

A. What were the names? LaQuyn Collier was one. And Albert Collins was the second.

Q. Okay. Do you know what their job titles was at the time?

A. LaQuyn Collier was a school secretary. And Albert Collins was a dropout prevention specialist.

Q. Okay. And those were all the individuals involved in the attendance fraud; is that correct?

A. That had immediate involvement, yes.

Q. All right. Now, do you know when the attendance fraud took place? A. I believe it was the years -- actually, when I was a principal is when I believe it occurred. My guess is somewhere between 2013 -- 2013, 2014.

Q. All right. Now, at any point, were you ever concerned that your school might be have been involved?

A. No. Q. Now, you mentioned Albert Collins and LaQuyn Collier. What are their -- do you know what their gender and race are?

A. LaQuyn Collier is a black female. And Albert Collins is a black male.

Q. Do you know what happened to them? A. They were both terminated. **See App. 484-789 R.Doc. 47-2 at 349:22-353:2**.

Dr. Collier went on to testify that:

Q. Okay. You said he was sharing with Luis Cordoba or was he sharing it with anyone else?

A. It was mainly Luis Cordoba. But I think he also shared it with some of the other executive leaders, like Dr. Bedell and Mr. Tunis as well.

Q. All right. What about the non-executive leaders, Collier and Collins?

A. I don't recall that he ever actually had immediate communication with them. Those folks reported under Dr. Cordoba. So he was sharing this

information with Dr. Cordoba and kind of checking back where are we now, that kind of thing.

Q. All right. Dr. Cordoba worked in what role?

A. He was the chief student support services officer. Something that along those lines. I'm trying to remember the exact title. Chief of student support services.

Q. Chief of student support services?

A. Yes.

Q. And did he oversee any employees in that role?

A. Yes, he did.

Q. Okay. And let me ask you this, easier. Did he oversee any departments in that role?

A. Yes, he did.

Q. What departments did Cordoba oversee?

A. He oversaw our trauma staff, so like social workers, all nurses, security, our dropout prevention staff. And that may be all.

Q. Okay. All right. Now, I believe that you stated that Ms. LaQuyn Collier was in a role of secretary?

A. That's correct.

Q. Is that correct?

A. Yes.

Q. So would that be at a school?

A. Yes, she was at a school.

Q. Okay. She was wasn't in the trauma, security, or dropout prevention department; correct?

A. She wasn't in that department. But our school secretaries are connected with those teams because our secretaries at the school are the ones who sort of shepherd the attendance. So when the dropout prevention folks are doing their work, they're in communication and they meet regularly with our school secretaries.

Q. All right. So dropout prevention specialists meet regularly with school secretaries?

A. At least their supervisor. There are times when they're all together. But their supervisor will meet with them as well, with the secretaries.

Q. Okay. All right. And -- okay. Now, so if Collier was not directly under Cordoba, how was she connected to this?

A. Because, once again, the secretaries meet regularly with those -- with that team. Because they are responsible, once again, for shepherding the attendance at the building. And so that team monitors our dropouts. They

monitor the attendance as well. And so there are conversations that happen with those folks.

Q. Okay. All right. And you say "secretaries," plural; correct?

A. Yes. All secretaries.

Q. Okay. Do you know how many secretaries there in KCPS?

A. In most cases, there's one per building. Some of the larger buildings may have two. So I would say probably anywhere between 36 to 40 secretaries.

Q. But just to be clear, the investigation only revealed that one secretary was involved; correct?

A. Yes.

Q. Okay. Now, do you know what role that Albert Collins worked in?

A. He was a dropout prevention specialist.

Q. Now, was he in management or supervising any employees?

A. No, he was not. **See App. 484-789 R.Doc. 47-2 at 370:6-373:23**.

Overton previously testified as follows regarding her knowledge of the

attendance fraud:

Q.· · ·All right. Are you familiar with the attendance investigation?

A.· · I know of it, but I'm not familiar. I wasn't part of that investigation.

Q.· · ·Do you know who was?· · · · ·

A.· · ·Had to have been our Legal Department.· · · · ·

Q. Okay.· Now you say Legal Department, so you never interviewed or questioned any employees regarding any allegations of attendance fraud?

A.· · ·There was a period of time that I did interview some staff for Legal.· But then once we interviewed just to talk about their role during that period of time, then Legal took over it. So I didn't complete an investigation. I didn't follow up or anything like that.· We were just asked to interview a few staff members.· 

Q.· · ·Okay.· And who were those staff members that you investigated -- that you interviewed?· · · ·

A.· · ·I don't recall.· · · ·

Q.· · ·So, trying to make sure that I got my notes right.· So it says that you interviewed a few staff members for Legal to discuss their role, but Legal is who concluded the investigation?· · · ·

A.· · ·Correct.· · · ·

Q.· · ·Okay.· And you don't recall who those staff members were that you interviewed?· · · · ·

A.· · ·No, I don't. · · · ·

Q.· · ·And do you know anything related to the finding of that investigation?

A.· · ·No. · · · · ·

Q.· · ·Okay.· Do you recall any of the information that you received from anyone that you interviewed related to any alleged attendance fraud? · ·

A.· · ·No. **See App. 977-984 R.Doc. 47-5 at 118:12-119:21**.

Overton further testified that:

Q.· · ·Did you ever conduct any investigation into any alleged behavior by Mike Reynolds or anyone who was accused of attendance fraud? · · · · ·

A.· · ·No

Q.· · ·Do you know anyone who was particularly, who was accused of attendance fraud? ·

A.· · ·Do I know of anyone? · · · · ·

Q.· · ·Right.· Do you know any names specifically of anyone that was involved in that? ·· · · ·

A.· · ·I do know a couple of employees that I ·was terminated -- that was terminated.· But I cannot recall their names. **See App. 977-984 R.Doc. 47-5 at 122:22-123:8.**

Overton further testified:

Q. Now, do you recall -- I think you said that you -- now, before I sit down, you stated that you conducted some early interviews with folks regarding the attendance fraud. But that was early on before it was sent to an outside firm; correct?

A. Correct.

Q. Who were those individuals that you interviewed?

A. Oh, my gosh. I can't think of his name. It was the dropoff specialist, dropout specialist. I can't think of his name. Gosh. Albert Collins.

Q. Okay. Did you interview anyone else?

A. I can't recall all of who I interviewed.

Q. Okay. A. It was just a short period of time after we met with Albert, then the decision was made to take it outside.

Q. Okay. So based on the information that you received from Albert, the decision was made to take it outside?

A. Correct.  **See App. 484-789 R.Doc. 47-2 at 684:21-685:16**.

KCPS sought to strike LC's pending lawsuit[6], Johnson's lawsuit, and Waterman's lawsuit where other African American employees alleged harassment, discrimination, and retaliation as well as whistleblowing attendance fraud.[7]

## SUMMARY OF THE ARGUMENTS

Collins appeals to this Court to find Judge Fenner erred in granting KCPS summary judgment holding that:

1.     Collins' race claim fails because the circumstances surrounding his termination do not permit an inference of discrimination;

2.     Bishop, LC, and other employees were not proper comparators to Collins because of different behavior, job titles and supervisors;

3.     Hearsay evidence was properly considered by the Court;

4.     Collins' retaliation claim fails because no evidence he engaged in protected activity;

5.     KCPS provided a legitimate non-discriminatory reason for firing Collins lacking pretext; and

---

[6] Collins ask the Court to take Judicial Notice of LaQuyn Collier's lawsuit filed in Jackson County, 16th Judicial Circuit, Missouri. Case No. 2016-CV14140, filed June 26, 2020 alleging amongst other things race discrimination and retaliation under the MHRA, as well as whistleblower claims under RSMo 105.055. See App. 1423-1443.

[7] Collins again asks the Court to take Judicial Notice of the relevant lawsuits related to attendance fraud.

6.     RSMo. 105.055 allows Collins to be fired under a statutory exception.

Collins believes this summary of the arguments aforementioned herein are the main issues at hand.

### A.                    Standard of Review.

Summary judgment is appropriate only when courts determine there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). A fact is material if it might affect the outcome of the suit," and a genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir.2016). An appellate court reviews a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmovant. *Id.* In addition, a motion for summary judgment must be viewed in a light most favorable to the non-moving party, and that party must receive the benefit of all reasonable inferences to be drawn from the underlying facts. *Agristor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). The nonmoving party must point to evidence in the record demonstrating the existence of a factual dispute. FED.R.CIV.P. 56(c)(1); *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 909–10 (8th Cir.2010). An appellate court reviews the admission of evidence for an abuse of discretion. *Id.*

"Genuine" implies that the issue, or dispute, must be a real and substantial one, and not consisting merely of conjecture, theory and possibilities. *ITT Commercial Fin. Corp. v. Mid-America Marine Supp. Corp.*, 854 S.W. 2d 371, 378 (Mo. banc 1993). As the trial court's judgment is founded on the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment. *Id.*

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Liberty Lobby, supra,* at 255, 106 S.Ct. 2505. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. *Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133, 151 (U.S. 2000).

**B.**          **Arguments, Authorities & Analysis.**

**I.**     **Whether Court erred in granting summary judgment to KCPS under Fed. R. Civ. P. 56(c) because there was sufficient evidence to support a finding that the circumstances surrounding Collins termination gave rise to an inference of racial discrimination under Title VII. (App. 1327-1357 R.Doc. 99 at 1-31; App. 1358-1360 R.Doc. 100 at 1-3).** *Beasley v. Warren Unilube, Inc.*, **933 F.3d 932, 937 (8th Cir. 2019).**

> **A. Bishop, LC, and other employees in fraud are proper comparators to Collins.** *Sprint/United Mgmt. Co. v. Mendelsohn*, **552 U.S. 379, 388 (2008).**

**B. The Court relied upon inadmissible hearsay in granting summary judgment in the form of sham declarations.** *Bryant v. Bryan Cave, LLP*, **400 S.W.3d 325, 332–33 (Mo. App. E.D. 2013);** *Button v. Dakota, Minnesota & Eastern R.Corp.*, **963 F.3d 824, 830 (8th Cir.2020).**

Title VII claims are analyzed under the framework outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). "Under *McDonnell Douglas,* the plaintiff has the initial burden to establish a prima facie case for each claim." *Watson v. McDonough,* 996 F.3d 850, 854 (8th Cir. 2021). Where there is no direct evidence of discrimination, a plaintiff must satisfy his burden of proving intentional discrimination by using the familiar burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for both § 1983 and Title VII claims. *Burton v. Ark. Sec'y of State*, 737 F.3d 1219, 1229 (8th Cir. 2013) (§ 1983 claim); *Shirrell v. St. Francis Med. Ctr*., 793 F.3d 881, 887 (8th Cir. 2015) (Title VII claim). Direct evidence exists when a remark is made "by a decisionmaker and `show[s] a specific link between a discriminatory bias and the adverse employment action, sufficient to support a finding by a reasonable fact-finder that the bias motivated the action.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1045-46 (8th Cir. 2011).

## Prima Facie Case of Disparate Treatment Discrimination

To establish a prima facie case of discrimination under either Title VII or §1983, a plaintiff must make a minimal evidentiary showing that he or she (1) is a member of a protected class, (2) was qualified for the position or met his or her employer's legitimate expectations, (3) suffered an adverse employment action and (4) that the circumstances of his or her employment, or adverse employment action, gives rise to an inference of discrimination. App. 1327-1357 R.Doc. 99 at . *Burton*, 737 F.3d at 1229 (8th Cir. 2013) (discharge under § 1983); *Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 937 (8th Cir. 2019) (discharge under Title VII);; *see also Mahn v. Jefferson Cty., Mo.*, 891 F.3d 1093, 1096 (8th Cir.2018) (establishing a prima facie case requires a minimal evidentiary showing). Establishing a prima facie case creates a presumption that the employer discriminated against the plaintiff. *Banks v. Deere*, 829 F.3d 661, 666 (8th Cir. 2016).

Here, the Court agrees that Collins has met his burden under the first three elements 1) being an African American; 2) KCPS presented no evidence that Collins was deficient at his job performance, was disciplined, or failed to meet legitimate job expectations; and 3) his suspension and firing is an adverse employment action. **App. 1327-1357 R.Doc. 99 at 15-17**. The only reason Collins was fired was attendance fraud. *Id.* Despite widespread attendance fraud, KCPS

only fired two African American, non-managerial or decision-making employees in Collins and LC**. App. 375-427 R.Doc. 47 at 13-34 ¶52, 61, 71, 135, 159; App. 841-910 R.Doc. 47-4 at 42:13-45:20, 46:15-48:23, 57:20-59:20**. KCPS identified white, managerial, decision-makers who were not fired. Further, the fact that Collins and LC were treated differently and are both black creates an inference of discrimination.

### § 1983

For a governmental entity to be liable under § 1983, the constitutional deprivation must have been "committed pursuant to an official custom, policy, or practice," or the violation must be "so pervasive among non-policymaking employees...'as to constitute a custom or usage with the force of law.' " *Granda v. City of St. Louis*, 472 F.3d 565, 568 (8th Cir. 2007) (citation omitted)). The Eighth Circuit carefully differentiates between claims based on custom and those based on policy. *See Ware v. Jackson County, Missouri.*, 150 F.3d 873, 880 (8th Cir. 1998). To establish a claim for "custom" liability, a plaintiff must demonstrate:

> 1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
> 2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
> 3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation. *Johnson v. Douglas Cnty. Med. Dep't,* 725 F.3d 825, 828 (8th Cir. 2013) (citation omitted). Plaintiff alleges that

the City "has a custom, practice or usage of silencing employees and falsifying the public record and punishing employees for the exercise of their First Amendment rights." *Id.*

KCPS said Collins was one of seven (7) employees involved in attendance fraud. **App. 375-427 R.Doc. 47 at 33 ¶157**. However, with it being untrue KCPS tries to distinguish Collins from other KCPS employees. **Id. at 29-35 ¶135-138, 157-159.; see also App. 158-175, 312-329 R.Doc. 39-41 at 1-2, 1-16, & 1-18; App. 227-230 R.Doc. 40-4 at 1-4, App. 218-226 R.Doc. 40-3 at 1-9**. The fraud included the KCPS leadership team and the superintendent. **App. 375-427 R.Doc. 47 ¶169; App. 484-789 R.Doc. 47-2 at 370:6-373:23**. This widespread fraud is the very essence of what is required by law.

KCPS tries to justify the widespread fraud without discipline blaming flawed information received from an unknown or unidentified member of KCPS's leadership team, and were not done willingly and knowingly breaking District rules and regulations. **App. 375-427 R.Doc. 47 at 29-36 ¶133-138, 140-147, 153-162, 164-172; App. 218-226 R.Doc. 40-3 at 1-9; App. 227-230 R.Doc. 40-4 at 1-4.**. Dr. Collier's declaration is misleading and false. **Id.; see also App. 790-840 R.Doc. 47-3 at 42:13-45:20, 46:15-48:23, 57:20-59:20**. Dr. Collier and Overton provided "sham declarations[8]" on behalf of KCPS confirming allegations of

---

[8] See argument regarding "sham declarations" or "sham affidavits" below herein.

Collins, Johnson, LC, and Waterman, which is that the attendance fraud was a districtwide occurrence. *Id.*; *see also* lawsuits of *LC*, *Johnson*, and *Waterman*.

An appellate court may take judicial notice of a fact for the first time on appeal," *Gustafson v. Cornelius Co.*, 724 F.2d 75, 79 (8th Cir. 1983), and that we may consider matters incorporated by reference in the Amended Complaint and matters of public record, see *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017). The Court is permitted to "take judicial notice of its own records and may take judicial notice of the records of other cases when justice so requires." *Vogt v. Emmons,* 158 S.W.3d 243, 247 (Mo. App. E. D 2005); *see also Perkel v. Stringfellow*, 19 S.W.3d 141, 149 (Mo. App. S.D. 2000).

KCPS goes on to erroneously dispute Collins material facts alleging that:

Based on the information Collins provided to KCPS officials during the interrogation of him on or about February 28, 2019, KCPS determined that it needed to outsource the investigation into the attendance fraud since Collins provided so much information about the issue being widespread throughout KCPS and top members of leadership including the superintendent being involved. **App. 375-427 R.Doc. 47 at 35 ¶169**.

KCPS alleged that only seven employees were involved in the attendance fraud however this is inaccurate. **Id. at 34 ¶158; see also App. 999-1000 R.Doc. 47-10 at 1-2**.

Of the seven people identified to be involved in the attendance fraud by KCPS, Collins and Collier were the only two who were black, they were not decisionmakers, and they were also the only two who were

fired. **Id. ¶159; App. 841-910 R.Doc. 47-4 at 42:13-45:20, 46:15-48:23, 57:20-59:20**.

KCPS has no good faith basis for disputing these facts except to mislead the Court so that this matter does not proceed to trial. Overton has testified repeatedly KCPS outsourced the investigation because of information Collins provided during them February 28, 2019 regarding widespread fraud. Id. ¶168-169. KCPS does not dispute "Collins was interviewed numerous times by investigators and leadership." **App. 1024-1054 R.Doc. 50 at 16 ¶170-171**. The sole reason Collins was fired was attendance fraud. **App. 1327-1357 R.Doc. 99 at 16**. On November 20, 2019, KCPS issued a memo titled "KCPS Proactively Addresses Inaccurate Attendance Data." **App. 999-1000 R.Doc. 47-10**. In that memo, KCPS summarily admits that:

- In January 2019, KCPS learned of possible attendance data inaccuracies that occurred over a three-year period from 2014-2016. With this, KCPS immediately began an internal investigation in February 2019, and upon further review, the KCPS team decided to move the investigation into the attendance data to an outside investigative entity.
- The independent investigation of reports regarding altered student attendance records over a period of three school years, 2013-2014, 2014-2015 and 2015- 2016, revealed that a small circle of KCPS employees changed student attendance records in KCPS's student information system to increase the percentage of students who were reported as present for 90 percent of the school year.
- These actions resulted in a higher percentage of students attending class being reported to the state and KCPS receiving a higher-than-earned score in the Missouri School Improvement Performance Standards. This misreporting also resulted in KCPS receiving more funding from the state than it was actually due.

- Significant changes in human resources policy, personnel and organizational culture were instituted by KCPS in the 2016-2017. These policies make it much easier for employees to report incidents without feeling pressured to engage in improper behavior.
- The investigation implicates seven individuals who were involved. **App. 999-1000 R.Doc. 47-10**.

The memo states those involved were no longer employed by KCPS as of November 19, 2019 but it is undisputed that Collins and LC were fired December 9, 2019. **App. 375-427 R.Doc. 47 at 6-36 ¶8, 20-21, 117, 173; App. 999-1000 R.Doc. 47-10 at 1-2**. Collins had no culpability in the fraud, unlike the decisionmakers and KCPS leadership referenced. Collins did nothing different than the "secretaries and other personnel" who allegedly mistakenly relied on the "flawed interpretation" of an unknown KCPS leadership employee. **App. 375-427 R.Doc. 47 at 29-36 ¶134-147, 153-161; App. 218-226 R.Doc. 40-3 at 1-9; App. 227-230 R.Doc. 40-4 at 1-4**. KCPS acknowledges Collins did not believe he did anything wrong. **App. 375-427 R.Doc. 47 at 16-35 ¶68, 72, 78, 109, 149, 168**. Despite being a non-management KCPS employee who worked with attendance data Collins is somehow charged by KCPS with illegal knowledge and intent while others were not. **App. 218-226 R.Doc. 40-3 at 1-9; App. 227-230 R.Doc. 40-4 at 1-4; App. 375-427 R.Doc. 47 at 29-36 ¶68, 72, 78, 109, 134-147. 149, 153-172**. The evidence suggest Collins & LC's willingness to come forward and speak of the corruption at KCPS was their wrongdoing. **Id.**

## ME TOO COMPARATORS OR SIMILARLY SITUATED

Collins was similarly situated to LC, a African American secretary fired for attendance fraud. **Id**. Collins was also similarly situated to every other KCPS employee who committed fraud including Bishop, a white male who was not fired for his leadership role in the attendance fraud. **App. 218-226 R.Doc. 40-3 at 1-9; App. 227-230 R.Doc. 40-4 at 1-4; App. 375-427 R.Doc. 47 at 29-36 ¶68, 72, 78, 109, 134-147. 149, 153-172**. The KCPS decision-makers regarding attendance fraud were Dr. Collier who is now the superintendent and was the head of HR when she fired Collins, and Overton who was the Director of Employee Relations, and possibly the superintendent. **App. 218-226 R.Doc. 40-3 at 1-9, App. 227-230 R.Doc. 40-4 at 1-4, App. 375-427 R.Doc. 47 at 35-36 ¶164-172**.

Bishop was in the IT department. R.Doc. 47 ¶37-38, 50, 118-119. Reynolds, was a fraud decision-maker over IT. **Id. at 34-35 ¶159-161; App. 841-910 R.Doc. 47-4 at 57:20-59:20**. If Bishop's boss and department are directly involved in the fraud, there is no way KCPS can declare in good faith that Bishop was not involved, or at least allow it to be a question for the jury. KCPS tries to mislead the Court stating KCPS & third-party investigators found that Bishop had not altered any attendance records. **App. 375-427 R.Doc. 47 at 29 ¶134**. However, that does not mean that he did not play a leadership role. Bishop, LC, Waterman, Reynolds

are "me too" comparators. **Id. at 13-35 ¶52, 61, 71, 135, 159; App. 484-789 R.Doc. 47-2 at 349:22-353:2**. Waterman was fired a month after Collins and LC for conduct that allegedly occurred in December 2019 while she was on medical leave. Waterman alleged whistleblower claims as well as race discrimination and retaliation and was fired by Dr. Collier and Overton. Waterman is also African American also alleged in her lawsuit that KCPS attendance fraud was widespread and "ongoing." Waterman also alleged race discrimination because she was fired under false pretenses while white employees such as Bishop who had an active leadership role in the attendance fraud was not fired.[9] Waterman was the administrative assistant for Reynolds, who was allowed to resign for his leadership role in the attendance fraud. **Id. at 29-30 ¶135-138; App. 977-984 R.Doc. 47-5 at 121:6-23**.

The Eighth Circuit has held "me too" evidence should normally be freely admitted at trial because "an employer's past discriminatory policy and practice may well illustrate that the employer's asserted reasons for disparate treatment are a pretext for intentional discrimination." *Dindinger*, 853 F.3d at 424 (quoting *Hawkins v. Hennepin Tech. Ctr.*, 900 F.2d 153, 155–56 (8th

---

[9] See Waterman lawsuit previously referenced which Collins asked the Court to take Judicial Notice of Waterman's lawsuit.

Cir.1990)). In *Dindinger*, the Court found there was a clear link between me too witnesses even though there was a temporal distance of seven years for witness.

To determine whether "me too" evidence is admissible, the Court must engage in a case-by-case analysis of the "me too" evidence to ascertain, among other things, the context of that evidence, and how closely related that evidence is to the facts and arguments in the matter being tried. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008). In *Sprint*, the Court defined similarly situated as: same decisionmakers in the adverse employment action and close temporal proximity. *Id.*

KCPS never identified any supervisor for Collins except Johnson and Pearson who replaced Johnson at some point, but no evidence suggests anyone except Dr. Collier & Overton were the decisionmakers regarding the attendance fraud employees. **App. 218-226 R.Doc. 40-3 at 1-9; App. 227-230 R.Doc. 40-4 at 1-4; App. 375-427 R.Doc. 47 at 16-36 ¶68, 72, 78, 109, 134-147. 149, 153-172**. In *Yates*, the Court held that under Rule 801(d)(2)(D), it is not necessary that they be the actual decision-makers. "Significant involvement, either as advisor or other participant in a process leading to a challenged decision," may be sufficient to establish agency under Rule 801(d)(2)(D). See *Yates v. Rexton, Inc.*, 267 F.3d 793, 802 (8th Cir. 2001) citing *Equal Employment Opportunity Comm'n v. Watergate at Landmark Condo.,* 24 F.3d 635, 640 (4th Cir.1994).

Further, the evidence clearly suggests that the attendance fraud was a districtwide occurrence given the folks found to be involved in the decision-making process when the attendance fraud took place. Collins, who was an attendance ambassador and LC, who was a school secretary were the only two identified who were not in charge of entire departments or upper leadership positions. **App. 218-226 R.Doc. 40-3 at 1-9, App. 227-230 R.Doc. 40-4 at 1-4, App. 375-427 R.Doc. 47 at 33-36 ¶153-162, 164-172**.

Collins worked alongside countless KCPS employees who were school principals, secretaries, and IT personnel to perform his job duties which included correcting and adjusting attendance. **App. 375-427 R.Doc. 47 at 33-34 ¶153-161**. Johnson supervised as many as fourteen KCPS employees in his department and oversaw attendance parties where every district secretary would come to KCPS headquarters to engage in attendance fraud. **Id. ¶153-155**. These facts show fraud went far beyond seven employees, "an inference of discrimination. **Id. at 30-35 ¶136-138, 158-161**. The Court stated LC's conduct was somehow different than Collins because she was a secretary. **Id**. However, this finding is not supported by any evidence, especially given that Dr. Collier's declaration now states that secretaries did not use discretion and were not disciplined. **App. 218-226 R.Doc. 40-3 at 1-9; App. 375-427 R.Doc. 47 at 32 ¶147**.

KCPS does not provide any foundation or evidence beyond inadmissible hearsay as to how it determined Bishop's role. Id. Dr. Collier and Overton's declarations creates a genuine issue of material fact as to what role Bishop had in attendance fraud. Dr. Collier declared Bishop's job title was Data Warehouse Project Leader while Overton declared Bishop was a Information Technology Specialist. **App. 218-226 R.Doc. 40-3 at 1-9 ¶37-44; App. 227-230 R.Doc. 40-4 at 1-4 ¶23-24**. Further, Dr. Collier and Overton's assertions about Bishop's and others' responsibilities and involvement with the fraud is inadmissible, improper hearsay without an exception. **App. 218-226 R.Doc. 40-3 at 1-9; App. 227-230 R.Doc. 40-4 at 1-4**.

## INADMISSIBLE HEARSAY

Hearsay evidence consists of an out-of-court statement offered to prove the truth of the matter(s) asserted therein and that "depends on the veracity of the statement for its probative value." *State v. Kemp,* 212 S.W.3d 135, 146 (Mo. banc 2007), *Bryant v. Bryan Cave, LLP,* 400 S.W.3d 325, 332–33 (Mo. App. E.D. 2013) (stating only limited exceptions or exclusions to prohibition against hearsay exist). affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Rule 56(e). When

an affidavit contains an out-of-court statement offered to prove the truth of the statement that is inadmissible hearsay, the statement may not be used to support or defeat a motion for summary judgment. *See Pink Supply Corp. v. Hiebert, Inc.,* 788 F.2d 1313, 1319 (8th Cir.1986).

Here, KCPS provided 147 statements of fact in support of summary judgment. **App. 312-329 R.Doc. 41 at 1-18**. KCPS relied solely on Dr. Collier's declaration for 38 of their statements of fact. **App. 158-159, 160-175, 312-329 R.Doc. 39-41 at 1-2, 1-16, & 1-18; App. 218-226 R.Doc. 40-3 at 1-9**. KCPS also based 17 statements of fact solely on Overton's declaration. R.Doc. 39-41; R.Doc. 40-4. Combined, KCPS based 50 of their statements of fact solely on the declarations of Dr. Collier and Overton. R.Doc. 39-41; R.Doc. 40-3; R.Doc. 40-4. Judge Fenner relies heavily on declarations from Dr. Collier and Overton as opposed to their deposition testimony. **App. 1327-1357 R.Doc. 99 at 12.**

The inconsistencies of Dr. Collier and Overton not only impeaches their previous testimony but also brings into question the scope and duration of the attendance fraud. KCPS acknowledges fraud is the sole reason Collins was fired. R.Doc. 99. Dr. Collier and Overton's declarations erroneously provide improper & unsupported context, motive, and justification for widespread attendance fraud based on no other evidence which is improper hearsay.

A statement is a sham "if it contradicts prior testimony or is a sudden and unexplained revision of testimony [that] creates an issue of fact where none existed before." *Button v. Dakota, Minnesota & Eastern R.Corp.*, 963 F.3d 824, 830 (8th Cir.2020). *See also Abuy Develop., L.L.C. v. Yuba Motorsports, Inc.*, No. 4:06CV799SNL, 2008 WL 1777412, at *14 n.14 (E.D. Mo. Apr. 16, 2008) (finding a sham declaration). A contradictory statement must be directly contradictory to be a sham. *Baker v. Silver Oak Senior Living Manag. Co.*, 581 F.3d 684, at 690–91 (8th Cir.2009)  When a statement is a sham, the court must disregard it when ruling on summary judgment. *Garang v. City of Ames*, 2 F.4th 1115, 1122 (8th Cir.2021). The declarations for Dr. Collier and Overton are materially different from their deposition testimony and should not be relied on by the Court to defeat summary judgment. **App. 375-427 R.Doc. 47 at 22-26 ¶99, 101-116, 118-120, 134-138, 140-147, 153-161, 164-172**.

Further, Dr. Collier's declaration as to the findings of any investigation as it pertained to attendance fraud, Bishop, or the motive, state of mind or reasoning for the actions of the KCPS employees who engaged in attendance fraud, regardless of whether they were fired or not is inadmissible hearsay. *Bryant v. Bryan Cave, LLP*, 400 S.W.3d 325, 333 (Mo. App. E.D. 2013) citing *Uhle v. Sachs Electric,* 831 S.W.2d 774, 777 (Mo.App. E.D.1992) (where the Court held that: "a witness's attempt to state what was in someone else's mind is either speculation or

unadulterated hearsay). Foundational requirements to which qualified witness

must attest under business record exception to hearsay rule are:

> that declarant in records had knowledge to make accurate statements: (2) that declarant recorded statements contemporaneously with actions which were subject of reports; (3) that declarant made record in regular course of business activity; and (4) that such records were regularly kept by business. *U.S. v. Console*, C.A.3 (N.J.) 1993, 13 F.3d 641, certiorari denied.

("An affidavit which relates information gained from other documents

relates hearsay, not such facts as would be admissible in evidence, and is not

sufficient to support a motion for summary judgment.") *May & May Trucking,*

*LLC v. Progressive Northwestern Ins. Co.*, 429 S.W. 3d 511 (Mo. App. W.D.

2014). The affidavit should not have been considered. *See Id. citing Fitzpatrick v.*

*Hoehn,* 746 S.W.2d 652, 655 (Mo.App.E.D.1988). In *State Farm Fire*, the Court

held that:

> the Federal Rules of Evidence identify hearsay as: a statement that:
> (1) the declarant does not make while testifying at the current trial or hearing; and
> (2) a party offers in evidence to prove the truth of the matter asserted in the statement. FED. R. EVID. 801(c). A court cannot consider inadmissible hearsay when deciding a motion for summary judgment because it can only assess the evidence on which a jury could rely, and a jury cannot properly rely on inadmissible hearsay. *Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005). *State Farm Fire & Casualty Co. v. Air Vents, Inc.*, 577 F. Supp. 3d 941 (N.D. Ia. 2021).

In *State Farm Fire*, a affiant who was alleged to be the corporate representative provided an affidavit based on information he was told by other employees and the Court found the affidavit to be inadmissible hearsay. *Id.* Dr. Collier had no legal basis to provide testimony regarding the investigation. Dr. Collier previously testified that she did not have immediate involvement in the investigation, and she was told information about the investigation, not that she reviewed any documents or had independent knowledge. Id. Collins directs the Court to caselaw suggesting the declarations contained inadmissible hearsay. In *Scheerer*, the Missouri Supreme Court held that:

> Incident report of restaurant patron's slip and fall in parking lot, that was prepared by non-witness employee of restaurant, was not admissible as business record. *Scheerer v. Hardee's Food Systems, Inc.*, C.A.8 (Mo.) 1996, 92 F.3d 702.

Hearsay exception for records kept in course of regularly conducted business activity does not encompass statements contained within business record that are made by third parties. *Johnson v. Herman*, N.D.Ind.2001, 132 F.Supp.2d 1130.

In *Calhoun*, the Court held "where witness played no role in creation of compilation of the royalty statements, and thus could not attest to their reliability, statements could not be admitted under the business record exception to the hearsay rule." *Calhoun v. Baylor*, C.A.6 (Tenn.) 1981, 646 F.2d 1158.

These cases show how Courts have repeatedly deemed information such as that contained in Dr. Collier's and Overton's declarations inadmissible hearsay and improper for use at summary judgment. Therefore, it was improper for the Court to rely on any Declaration from Dr. Collins or Overton about Collins' actions in the attendance fraud, that he somehow violated KCPS policy, or sent any confidential information. **App. 1327-1357 R.Doc. 99 at 7-8 citing App. 218-226 R.Doc. 40-3 & App. 227-230 R.Doc. 40-4**.

II.      **Whether Court erred in granting summary judgment to KCPS under Fed. R. Civ. P. 56(c) because there is evidence to support a finding that Collins engaged in protected activity. (App. 1327-1357 R.Doc. 99 at 1-31; App. 1358-1360 R.Doc. 100 pp. 1-3).** *EEOC v. Kohler Co.,* **335 F.3d 766, 772 (8th Cir.2003).**

      **A.  There is sufficient evidence of pretext to create a genuine issue of material fact despite any alleged legitimate reason KCPS gave for terminating Collins.** *Logan v. Liberty Healthcare Corp*.**, 416 F.3d 877, 880 (8th Cir.2005).**

As for retaliation claims, the *McDonnell Douglas* burden-shifting analysis "governs the order and allocation of proof for retaliation claims." *Kratzer v. Rockwell Collins. Inc.,* 398 F.3d 1040, 1048 (8th Cir.2005). Under this analysis, a plaintiff must first establish a prima facie case by showing he or she: "(1) engaged in statutorily protected activity; (2) he [or she] suffered an adverse employment action, and (3) there was a causal connection between the adverse employment action and the protected activity." *EEOC v. Kohler Co.,* 335 F.3d 766, 772 (8th

Cir.2003). If the prima facie case is met, the burden shifts to the defendant to produce "a legitimate, non-retaliatory reason for the action it took against the plaintiff." *Id.* If the defendant satisfies its burden, the plaintiff is "then obliged to present evidence that (1) creates a question of fact as to whether [defendant's] reason was pretextual and (2) creates a reasonable inference that [defendant] acted in retaliation." *Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 833 (8th Cir.2002).

**PRETEXT**

This Court has previously held that:

"A plaintiff may show pretext . . . by showing that an employer . . . treated similarly-situated employees in a disparate manner." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir.2010). Anyone with whom Plaintiff compares her treatment must be "similarly situated in all relevant respects"—that is, "the individual used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Evance v. Trumann Health Servs., LLC*, 719 F.3d 673, 678 (8th Cir.2013) (citations omitted).

In *Logan*, the Court found "the threshold of proof necessary to establish a prima facie case is minimal." *Logan v. Liberty Healthcare Corp*., 416 F.3d 877, 880 (8th Cir.2005) "The timing of [an adverse action] in relation to ... protected activity can sometimes strong evidence to establish causation for purpose of establishing a prima facie case as well as pretext." See *Id.* citing *Sherman v. Runyon,* 235 F.3d 406, 410 (8th Cir.2000).

To prove pretext, Collins needs substantial evidence. *Smith*, 302 F.3d at 834. "One method of proving pretext is to show that the employer's proffered explanation has no basis in fact." *Id.* Evidence from person involved in the decision-making process may reflect employer's retaliatory motive. *Kneibert v. Thomson Newspapers,* 129 F.3d 444, (8th Cir.1997). "[S]ubstantial changes over time in the employer's proffered reason for its employment decision [may] support a finding of pretext." *Kobrin v. University of Minnesota,* 34 F.3d 698, 703 (8th Cir.1994). The *McDonnell* Court found other evidence of pretext could be KCPS's treatment towards Collins prior to him engaging in protected activity, KCPS's policy and practice with respect to individuals in the protected class. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-805 (U.S.1973). In the absence of direct evidence of discrimination, the Court applies the burden shifting analysis. *Id.*

Here, the Court found there was no evidence Collins engaged in any protected activity and Collins' participation in the investigation cannot qualify as a protected activity in context because it did not implicate his protected status. **App. 1327-1357 R.Doc. 99 at 28**. However, the record clearly establishes that Collins was interrogated by Overton, Dr. Collier and other KCPS leadership in February 2019 before he was suspended and several times during his suspension. **App. 375-427 R.Doc. 47 at 35-36 ¶167-171**. The record also states that:

Prior to being put out on leave and during the meeting with KCPS officials, Collins not only provided information regarding the widespread attendance fraud but *also reported that he was a witness to Johnson's allegations of discriminatory and retaliatory treatment. Collins also disclosed that he believed that he was being discriminated against and provided examples of how he was no longer being considered for jobs and other promotional opportunities*. **Id. ¶168**.

However, Collins testified that when he was interrogated by KCPS leadership regarding Johnson's complaint, he provided information regarding witnessing the harassing, discriminatory, and retaliatory treatment Johnson received while employed, and advised how he could relate to Johnson's position of feeling harassed and mistreated and provided examples. **Id. ¶168-169**. It is undisputed that Collins met with KCPS leadership and investigators numerous times during his suspension regarding the allegations alleged. **Id. ¶167-172**. There is no evidence that anyone besides Collins and LC were ever interviewed. **Id**. In fact, the memo issued by KCPS summarily states:

"Significant changes in human resources policy, personnel and organizational culture were instituted by KCPS in the 2016-2017 school year to make it much easier for employees to report incidents without feeling pressured to engage in improper behavior. The findings within the report revealed an unhealthy culture within parts of the school district's staff several years ago. We have since worked tirelessly to build a new culture within KCPS, one that is geared toward achieving excellence while providing a workplace that inspires and empowers all people." **App. 999-1000 R.Doc. 47-10 at 1-2**.

Collins engaged in protected activity. **App. 375-427 R.Doc. 47 at 35-36 ¶167-172**. Collins provided Johnson the documents needed to make the report to DESE and to KCPS information regarding Johnson's motives for taking action against KCPS. **App. 45-66 R.Doc. 1-2 ¶41-48; App. 375-427 R.Doc. 47 at 35-36 ¶162, 164-172**.

The Supreme Court in *Reeves* held: It is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the ***falsity*** of the employer's explanation. *Reeves*, 530 U.S. at 147. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." *Wright v. West,* 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992).

The declarations for Dr. Collier and Overton are materially different from their deposition testimony and should not be relied on by the Court to defeat summary judgment. The Court rejects Collins's claims by saying Collins did not establish a prima facie claim and no evidence of pretext. **App. 1327-1357 R.Doc. 99 at 15-22**. The Court found KCPS provided a legitimate non-discriminatory reason for firing Collins because he altered attendance data in violation of KCPS policy. **Id**. However, so did all the other KCPS employees who were not disciplined for altering attendance data. There is no viable evidence to support a

48

distinction between Collins' conduct as a low level, non-managerial KCPS employee whose job duties involved adjusting student attendance data except the declarations of Dr. Collier and Overton.

KCPS alleged that Collins was required to be familiar with its policies, procedures, and applicable laws. **App. 158-159, 160-175, & 312-329 R.Doc. 39-41 at 1-2, 1-16, & 1-18**. There is no evidence suggesting other employees who were not disciplined were exempt from following KCPS policies, procedures, and applicable laws. In fact, given that the attendance fraud involved KCPS leadership involving the superintendent, this would suggest that Collins was following KCPS policies, procedures, and believed he was following applicable law as he testified. **App. 375-427 R.Doc. 47 at 13-35 ¶51, 149, 153-165, 168**. Collins was a good employee and had no performance issues. **Id**. The Court found Collins used his discretion when adjusting attendance data for students while other KCPS employees did not use their discretion. **App. 1327-1357 R.Doc. 99 at 3, 5-6, 18, 31**. However, if there were no supporting documents for the attendance changes which is attendance fraud, there is no evidence to state whether the countless other employees who engaged in attendance fraud used their discretion. **App. 218-226 R.Doc. 40-3 at 1-9**. Dr. Collier alleged Collins violated KCPS's GBCB Staff Conduct Policy. **App. 218-226 R.Doc. 40-3 at 1-9; App. 242-244 R.Doc. 40-11 at**

**1-3**. This policy is not unique to Collins or his job title. **App. 242-244 R.Doc. 40-11 at 1-3**. This policy applies to all KCPS employees, not just Collins. **Id**. If countless other non-managerial KCPS employees were given grace and not disciplined for falsifying student attendance records at the direction of KCPS leadership, then Collins should be treated the same way. The entire dispute of discretion came solely from Dr. Collier's declaration. **App. 375-427 R.Doc. 47 at 15-32 ¶61-62, 66, 71-72, 140-147; App. 218-226 R.Doc. 40-3 at 1-9**. This declaration from Dr. Collier about discretion came about only after her previous testimony about only seven (7) KCPS employees being involved was  impeached with undisputable evidence the attendance fraud was widespread throughout KCPS.

> **III.      Whether Court erred in granting summary judgment to KCPS under Fed. R. Civ. P. 56(c) because evidence that Collins was a whistleblower under the statute and no exception applied to justify his termination. (App. 1327-1357 R.Doc. 99 at 1-31; App. 1358-1360 R.Doc. 100 pp. 1-3).** *Hudson v. O'Brien*, **449 S.W.3d 87, 91-92 (Mo. App. W.D. 2014).**

>> **A. There is a genuine issue of material fact regarding whether Collins was a whistleblower regardless of his alleged actions.** *Warner v. Graham*, **845 F.2d 179, 182 (8th Cir. 1988).**

Generally, a federal court is bound by the interpretation of a state's statutes by the state's highest court. *Missouri v. Hunter*, 459 U.S. 359, 366-68 (1983). In the absence of such an interpretation, however, the federal court has the

"responsibility to predict, as best [it] can, how that court would decide the issue." *Brandenburg v. Allstate Ins. Co.*, 23 F.3d 1438, 1440 (8th Cir. 1994). The Missouri Supreme Court's "primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute at issue." *Parktown Imports, Inc. v. Audi of Am., Inc.*, 278 S.W.3d 670, 672 (Mo. 2009). The plain text of the statute supports Plaintiff's argument.

When considering a supplemental state law claim, the Court must apply Missouri law. *Smith v. Planned Parenthood of the St. Louis Region,* 225 F.R.D. 233, 237 (E.D.Mo.2004). The Court looks first to decisions of the Missouri Supreme Court. *Blum v. Allstate Ins. Co.,* 296 F.Supp.2d 1037, 1039 (E.D.Mo.2003). If no relevant decisions are available, the Court will look to Missouri appellate court decisions. *Id.* The Court's role is interpret state law, not fashion it. *Orion Fin. Corp. of S. Dak. v. Am. Food Group, Inc.,* 281 F.3d 733, 738 (8th Cir.2002). Thus, when state law is unsettled, it is the Court's duty to apply the rule it believes the Missouri Supreme Court would follow. *Novak v. Navistar Int'l Transp. Co.,* 46 F.3d 844, 847 (8th Cir.1995).

**RSMo. § 105.055**

When construed together, the provisions of § 105.055 do not exclude reports of wrongdoing to the wrongdoers. Section 105.055 provides:

No supervisor or appointing authority of any state agency shall prohibit a state employee from or take any disciplinary action4 whatsoever against a state employee ... for the disclosure of information which the employee reasonably believes evidences: (a) A violation of any law, rule or regulation; or (b) Mismanagement, a gross waste of funds or abuse of authority, or a substantial and specific danger to public health or safety, if the disclosure is not specifically prohibited by law[.] *Hudson v. O'Brien*, 449 S.W.3d 87, 91-92 (Mo. App. W.D. 2014) citing § 105.055.2(1)(a)-(b).

Thus, while § 105.055 requires the disclosure of information by a state employee, it does not identify to whom the disclosure of information must be made. Rather, it provides only that disciplinary action cannot be taken against state employees for the disclosure of certain information. *Id.*

Section 105.055.2 requires that the employee reasonably believes the disclosed information evidences "(a) [a] violation of any law, rule or regulation; or (b) mismanagement, a gross waste of funds or abuse of authority, or a substantial and specific danger to public health or safety, if the disclosure is not specifically prohibited by law[.]" § 105.055.2(1)(a)-(b). Therefore, to be entitled to relief under the statute, the employee must disclose information he or she reasonably believes evidences (1) a violation of any law, rule, or regulation, (2) mismanagement, (3) a gross waste of funds, (4) a gross abuse of authority, or (5) a substantial and specific danger to public health or safety. *Id.* In *Richest*, the Court acknowledged that Missouri caselaw on RSMo. § 105.055 is scant. *Richest v. City of Kansas City*, 643 S.W.3d 610, 616 (Mo. App. W.D. 2022).

KCPS argued Collins was not a whistleblower because he did not make a "disclosure" as required under the law and the law does not permit him to "blow the whistle" since he altered attendance records. **App. 158-159, 160-175, 312-329 R.Doc. 39-41 at 1-2, 1-16, & 1-18**. The only authority KCPS cited was Johnson where the Court held that there could be no disclosure of something already known. *Johnson v. City of Leadington*, No. 4:19-CV-02282-SEP, 2022 WL 179218, at *9 (E.D. Mo. Jan. 20, 2022). KCPS provides no other authority on this issue. The held that even if Collins disclosed new information, it does not create a triable question of fact because KCPS reason for firing him was he violated policy by participating in attendance fraud. **App. 1327-1357 R.Doc. 99 at 30-31**. Collins made a disclosure. **Id**.

The Court ignores the fact documents Johnson provided DESE to prove fraud were from Collins. **App. 375-427 R.Doc. 47 at 34 ¶165**. Evidence in the record shows Collins was not fired for changing student attendance records given that it was a districtwide issue. **Id. at 30-35 ¶140-147, 168-169; App. 218-226 R.Doc. 40-3 at 1-9**. Given the fact that the evidence suggests that only Collins and LC were ever interviewed and were also the only employees fired, then it is probable that the reason they were fired is because of the disclosures they made. **App. 375-427 R.Doc. 47 at 30-36 ¶137, 159, 172**.

No evidence exist that Collins was fired for violating KCPS policy. If every KCPS employee up to the superintendent was involved, there is no evidence that Collins did anything different than those who were not fired, except make a disclosure. It is reasonable to infer that any KCPS employee who made a disclosure about the attendance fraud was going to be fired. The two employees who volunteered information were fired. **App. 375-427 R.Doc. 47 at 34 ¶159; App. 841-910 R.Doc. 47-4 at 42:13-45:20, 46:15-48:23, 57:20-59:20**. This Court has previously held that "an official may not be charged with knowledge that his conduct was unlawful unless it has been previously identified as such." *Warner v. Graham*, 845 F.2d 179, 182 (8th Cir. 1988). It is undisputed that Collins had no idea he had done anything wrong until he was interrogated by KCPS officials. **App. 375-427 R.Doc. 47 at 16-35 ¶68, 78, 109, 149, 168**. Therefore, the Court's ruling on Collins being exception from whistleblower protection under RSMo. § 105.055 is erroneous and should be reversed.

## CONCLUSION

WHEREFORE, for all the reasons stated herein, Appellant respectfully requests that this Court reverse and vacate KCPS Court's order granting summary judgment and remand the matter to KCPS court for a jury trial on the merits.

## CERTIFICATE OF SERVICE AND COMPLIANCE FOR BRIEF OF APPELLANT

I hereby certify that on August 5, 2023, the foregoing was filed with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit using the e-filing system.

I further certify that this motion was prepared in 14-point typeface, Microsoft Word, converted to Portable Document Format and found to be virus free upon scanning, and this motion complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,921 total words.

Respectfully submitted,

**/s/Gerald Gray II**
Gerald Gray II, #67476
**G. GRAY LAW, LLC**
104 WEST 9TH STREET, SUITE 401
KANSAS CITY, MO 64105
(O) 816-888-3145
(F) 816-817-4683
ggraylaw@outlook.com
**ATTORNEY FOR PLAINTIFF-APPELLANT**